All right, our last case this morning is number 19-14294. Anthony Wilson v. Sean Flack et al. Mr. Filippovits. Thank you. May it please the court. My name is Jeff Filippovits. I represent Alamut Brian Spears, the plaintiff's appellant in this case. I'd like to begin by discussing the deliberate indifference claim and to show why the estate's claim should proceed to trial for nominal and punitive damages as well as pre-death pain and suffering. Construed in plaintiff's favor, the defendants were deliberately indifferent. The facts show that when EMS arrived, they learned that Wilson had run from the police for over a mile. Officers found Wilson in a They found Wilson seat belted in the backseat of a patrol car, hands cuffed behind his back, and he was non-responsive to questions. They then began a very brief assessment. The first and only diagnostic tool they used was a pulse oximeter. With that, they learned that Wilson's pulse or Wilson's oxygen level was 92 percent, and they knew that oxygen below 94 percent calls for the immediate administration of oxygen. They learned Wilson's pulse was 111, and under those circumstances, both defendants agree that that pulse required the use of an EKG and continuous cardiac monitoring. They knew Wilson remained non-responsive during the time they were at the car, and they knew that that was consistent with a lack of oxygen, also consistent with other medical emergencies such as a stroke or seizure. That alone required immediate transport. An officer who was inside the car next to Wilson then said to EMS, he's foaming at the mouth now, just so you know. Minutes later, they stopped their assessment. They recognized the assessment was not complete when they left. They had not concluded he was faking, and they agree EMS should not leave a patient without knowing the reason for the call. Let me ask you a question, Mr. Philip. It's like, from my reading of the briefs, and I haven't dug into all of the deposition testimony yet, the EMTs asked the police officers whether they wanted a transport to a hospital. Is that accurate or not accurate? That question was asked after EMS determined that he was quote-unquote okay and told police that. I believe there was a final offer of, we'll take him if you guys want us to. And the officers declined that, presumably based upon the EMS's representation that Wilson was okay. Right. Okay. So there was that statement made by one of the remaining defendants to the police officers. If you would like, we can take him. Yes. Okay. Got it. Thank you. So they left without providing any treatment. They left without getting any other information from the officers. And later at the jail, we hear Officer Smith, who is beside Wilson and beside EMS, when Wilson is now dead at the jail, and EMS arrives, and he describes the scene in the car. He actually says, Wilson looked just like this as Wilson is laying dead on the ground. He looked just like this. And they checked his pulse and said he was okay. There's additional circumstantial evidence that a jury could consider when assessing whether there was subjective knowledge. I wonder just what the import of what you just said meant. The officer at the jail said, Wilson just looks just like this, like this as he's dead, that he looked just like that, that he was dead when the EMTs were looking at him. That his, to the extent that EMTs say his appearance appeared normal, if an officer is saying he looked like this, which he looks like when he is dead, the implication would be his appearance was not normal. In other words, he might have been dead at the scene. No, he was not dead at the scene. We know that. He did have a pulse. He did have oxygen. He did, his eyes were open. He did at least turn slightly, at least based on one version of the facts, turn slightly in response to the paramedics. But overall, it demonstrates that the paramedics or EMS was presented with a scene of a young man who was not well. But there's no argument or evidence that he was dead at the scene. I'll just, so just to, I'll say, I think this case sort of, in my view, just speaking for for a trial, if the district court was correct to kick out this expert, what do you say about that? Well, I think that the, the parent's wrongful death claim turns on survivability. I agree with that. But the estate can bring a claim, a survivorship claim under Georgia law, which Georgia law authorizes for the recovery of pre-death damages. And in the context of a section 1983 case and deliberate indifference, this court has recognized that even in absence of compensable damages, a plaintiff is still entitled to recover both nominal and punitive damages. Yeah, I mean, I get that point. But part of the constitutional claim here is that you have to show that the actor that you're suing caused an injury. And it may be that the injury is not, doesn't lead to compensatory damages, but you still have to show that there was an injury that was caused not by natural causes, but by something that the state actor did. And so if this expert goes out, how can you show that what the EMTs did caused any injury at all? Well, first, with regard to pre-death pain and suffering and emotional distress resulting from it, I'll address that first. And then I want to address the availability of nominal and punitive damages, even in absence of that. Well, I mean, so I mean, I'll just grant you, I mean, I'll grant you he suffered. So there was suffering pre-death, but how did the EMTs contribute to that or cause that in any way? So what we're seeking here are damages for emotional distress pre-death. And so what that means is below the defendants argued that Wilson was conscious, right? They argued that there was no evidence to suggest he was unaware or could not respond and suggest that it would be speculation to say otherwise. That means Wilson's aware of his surroundings. If he's aware of his surroundings and he knows leading up to this, he said he can't breathe, he can't breathe, he can't breathe. And finally his rescuers arrived. They assess him for a couple of minutes. They say he's fine. And then they shut the door. He's aware of what's happening. He knows. What is the evidence that he's aware of what's happening? He, I mean, you just said that he looked like he was almost dead when the EMTs were there. Totally unresponsive. What, and again, I'm, as Judge Brasher said, back to, if you lose your expert, I think you lose everything. I don't see how you have anything left at this point. We have no expert testimony talking in any way about what his condition was. And in fact, Dr. Sperry, who's a coroner, he's not even never treated anybody with this. I don't think he even opined on suffering or anything like that. No, and the claim does not turn on physical pain and suffering. Again, this is based upon his awareness. And the issue here is at summary judgment, the defendant said he was conscious. Their argument is that he was conscious. If he was conscious, and Georgia law, as it relates to pre-death pain and suffering, allows a jury to infer and extrapolate the scene and state of mind in the seconds leading up to death, even. And so, you know, you can have a person in a coma, you can have somebody and their eyes will be open and they'll blink. But that's a very different scenario from whether somebody is conscious or suffering. But so he, how, as Judge Brasher said, our law is very clear. Any delay in medical treatment for that to count as part of the cause of action. Has to contribute. It has to cause a worsening of the suffering that was there before. And how does the fact that they are being, you know, not thorough, how does that make him suffer more in the condition that he's in? He barely knows where he is. How does that fact make him increase the suffering in any way? I think that there's a dispute, especially in light of the defendant's position below, as to whether he was aware or not. They are saying he was aware. Their argument is predicated on that. And so we, we accept that for the purposes of summary judgment. Okay, fine. He's aware people come in the car. They do the oxygen test. They do whatever. They shut the door. How does that make him suffer more? Because he knows that they just closed the door and left and he now he's alone and he has no help. He knows that. Isn't it? Isn't the answer also possibly that it extended the period of time in which he went through this mental distress. In other words, had they gotten him to a hospital and maybe this ties into the whole expert exclusion issue, he would not have been in that mental distress state for that long a period of time. Yes, absolutely. If, if he knows if, if someone is dying and they know they're getting the lifesaving care they need, they at least have the peace of mind that they're not dying alone in the back of a car after someone has said he's fine. If someone is denied care and their last thoughts as they're going out is no one is trying to save me. No one will come to save me. That I think a jury could award emotional distress damages for. Also, I think that in the context. Let me interrupt you for a second because I want to try to get to the second issue, at least a little bit. The exclusion of your expert. Are you aware of our recent decision in a case called more versus intuitive surgical decided last month? Yes. How do you think that case impacts, if at all, what the district court did in this case? I think that the district court here in excluding Dr. Sperry, as it relates to his qualifications, applied a per se rule that a forensic pathologist just can't testify as to survivability. And I think that more shows there. I believe the doctor was not experienced with the tool that was used during a surgery, nor was he experienced with similar tools, but he did have a knowledge generally of the surgery. And so I think the difference that the doctor there had performed 4000 hysterectomies. He knew what he was doing. He hadn't used that particular tool, but he knew how hysterectomies work, and he could reverse engineer to sort of figure out what the cause was for the problem in that case. You have a coroner who's never treated a patient, much less a patient with this very rare disease. What kind of expertise does that person have other than reading literature that I could read and get on the stand and testify? What expertise does he have to opine on the matters about which he was attempting to opine? His job is to determine the precise cause of death and the mechanism that leads to a person's cause of death. And so by reviewing the autopsy and the autopsy results, Dr. Sperry is able to determine that the death was the result of the signaling of cells, the resulting clotting, if you will, of red blood cells because the blood becomes less viscous in vital organs. The next step is whether his training experience and expertise allows him to say, does the provision of oxygen and fluids alleviate those causes? When he's determining the precise mechanism of a person's death, he has to narrow down exactly what went wrong and where it went wrong. But he was not ever able to say, nor has anybody ever been able to say, what the EMTs could have done that might have changed the outcome. He did provide his opinion that the provision of oxygen in a patient who is already suffering from low oxygen could stop the catechating sickling that's occurring during this event and that the provision of emergency fluids- How is that anything other than me reading an article and saying that? How is that anything other than rank speculation? It's based on his expertise as a forensic pathologist who understands what causes death. If he determines that a person died of dehydration, he has to know what effect dehydration has on the body. And if he's going to say dehydration, he has to know what level of hydration would not have caused that death. Fundamentally, though, the district court didn't even consider his training, education, and experience because the district court just applied this rule. He said he hasn't treated patients, therefore he can't testify. But just because he's not an expert in clinical diagnosis based on the signs and symptoms, he's an expert in the pathology, the underlying cause of disease, and the cause of death. And so the district court didn't even go past that. Once it said there was no clinical experience, the district court said that's enough. I think the district court did not analyze this as fully as it deserved to be. All right. Thank you very much. You've saved your time for rebuttal. Thank you. Mr. Markovich. May it please the court. My name is Robert Markovich, and I represent the Appalachians in this case. EMT, Sean Flack, and paramedic Brian Porterfield. I'd like to turn to the Daubert issue and the approximate cause issue first, and then I'll address the deliberate interference. My opponent wants to slice and dice their claim and say, well, pain and suffering is somehow different from other damages in this case. But again, your Honor should have noted it. Without proximate cause, they get no damages, pain and suffering or otherwise. But isn't the question, what does proximate cause? It's the proximate cause of what? If it's the proximate cause of death, then you've got a stronger argument. If it's the proximate cause of something else, it seems to me you might be on weaker footing. Well, there's no evidence at all of proximate cause as to pain and suffering. The only testimony from Dr. Sperry was that possessed to survivability. Without Dr. Sperry, they have no proximate cause evidence whatsoever. So they- But Mr. Markovich, you're a person who dies 20 minutes after assessment. You're telling me that person, and apparently you said that he was conscious or maintained that he was conscious at the district court level. So if a person dies 20 minutes after assessment, you're telling me there's no, and he was conscious at the time of assessment, there's no emotional distress that goes along with that 20-minute demise? I'm not saying that if he was conscious that he wasn't suffering some distress. What I'm saying is that the EMT and the paramedic who were on the scene had no contribution whatsoever to that because the undisputed evidence in this case is that there is no effective treatment for, to treat an ECAS event, which is what was going on. You're telling me the provision of oxygen would not have done him any good? That's correct, your honor. What's the testimony? What's the best testimony in the record on that point? Dr. Sperry himself said that his testimony was based, of course, he is a pathologist. He has no treatment. He has no experience in the treatment of SCT, that sickle cell trait, or SCD, sickle cell disease, much less ECAS, his only, the only basis for his testimony was five articles. No, no, I'm asking you, I'm asking you what evidence, I know you, you think that he's unqualified to testify, but you said that there was no, that the evidence was that there's no treatment for this. And I'm asking you, what's the best evidence in the record that there's no treatment that could have alleviated what he was going through? Okay, he relies on an article, and this is at page 166 of his deposition, it's doc 126 of the record. He quotes an official journal of American College of Sports Medicine, quote, no evidence based guidelines for managing an ECAST event are currently available. He also admitted at page 183 of his deposition, that's doc 126, question, why you believed that hydration and oxygen would have saved his life. There is no scientific peer reviewed article, which establishes that to be true, correct? That's correct. So he's admitting that the only basis for his opinion does not support his opinion. That's why his opinion was unreliable, and why the district court was correct in ruling as such. And because he is a pathologist with no experience, as I said, treating sickle cell trait, sickle cell disease, or ECAST, he said he doesn't consider himself to be an expert in quote, the clinical aspects of sickle cell trait. That's at his deposition at 25. For that reason, his opinion, which is again, the only basis to tie the EMT, that's John to any distress, any injury whatsoever by Mr. Wilson. Now, turning to the deliberate indifference. Well, wait, wait, before before you, I had the same question I had for Mr. Philip, and that is, could you tell me what effect, if any, you think our recent decision in Moore on Daubert has on this case?  The holding in that case was that the district court conflated experience with reliability. That didn't happen here. And in that case, the doctor did have about 4,000 surgeries worth of experience on the procedure that was issued. So I don't think it has any effect whatsoever. Okay, thank you. As to the deliberate indifference claim, which we haven't explored too much, but I just want to touch the elements on that. The court found that there's no evidence to support an inference that Flack or Porterfield were actually aware that Mr. Wilson, the decedent, was at risk of a serious medical harm and that even if they were, they still, in order to be liable, they had to have consciously disregarded that risk. So there's three elements to a deliberate indifference claim in this context. One is subjective knowledge of a risk of serious harm. That's the Supreme Court, Farmer versus Brennan. I don't think anybody disputes the legal standard that we're guided by, but the district, there's evidence in the record, I think, that one of the police officers told one of the EMTs that the gentleman was foaming at the mouth. That piece of testimony, that piece of evidence is not cited or discussed in the district court's order. So what do we do about that? Well, there's also no evidence, and I'm not dismissing that that might have significance medically, but there's no testimony in the record as to what foaming at the mouth means. That's one. That's not normal. That's not normal. Especially for some. Here's the way I look at the deliberate indifference issue on the knowledge of the risk. He's unresponsive, right? He has a high pulse, and he has low oxygen, relatively low oxygen. I give you that at that point in time, if the officers didn't tell him anything else the conditions under which they found him, that might have been the end of the legal inquiry. But when you put those three things together with foaming at the mouth, any medical person, any lay person would think that there's a problem, right? People don't foam at the mouth. Okay. So the response to that is I do think it's important to understand what Farmer says on because there are in your honor has picked out some facts from which an inference could be drawn that there was an issue. But the question here is not that they were aware of those facts, but whether they actually drew the inference that they actually understood him to be at serious risk of medical harm. This was not an instance where it was so obvious that he was at risk of serious medical harm that the jury would be free to infer that they actually knew. So that's my first response to that. That can't be right. I mean, a person, most defendants are not going to, in any scenario, criminal or civil, are not going to admit to their subjective state of mind to do something wrong. State of mind mens rea is usually proven through circumstantial evidence. Correct, right? And you just told me that a reasonable inference could be drawn about something. What could that reasonable inference be? Well, the inference could be that he was having trouble, but the standard is that they had to know that he was at serious risk of medical harm. Tell me how a medical professional in their position objectively could have thought, based on those four indicators, that he wasn't in serious trouble. Well, I mean, he was sitting upright in the backseat where they found him. How else are you going to be if you're propped up on a backseat of a car? Well, I mean, he could have been slumped over, Your Honor. But even if, even if they were subjectively aware that he was at serious risk of medical harm, they still had to consciously disregard, by means of reckless conduct, that serious risk. The reckless conduct, Your Honor, is in, that standard is in the Hopper case, which we submitted as supplemental authority last week. And that says, the Supreme Court itself has likened the deliberate indifference standard to subjective recklessness as used in the criminal law. Accordingly, no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the Supreme Court standard. So even if the paramedics were, sorry, the paramedic and EMT were negligent, they still had to prove reckless conduct. That means conscious disregard of a known problem. They did not consciously disregard this issue. They administered tests. Markovich, I coach high school sports. And so let me use that analogy for you for a second. Coaches are trained and told, even though they have no medical expertise, that the minute that a student athlete begins to show any sign whatsoever of heat stroke, they've got to get that person to medical care immediately. That's for a lay person dealing with a student athlete on the field, engaged in exertive physical activity. These are trained medical professionals with someone who is having problems of some kind culminating in foaming at the mouth. And you're telling me that that's not a conscious disregard of a serious risk? Conscious disregard. Our position would be that if they knew that he was at risk of death, essentially, and disregarded it, did nothing. Now it's possible. Does it have to be risk of death or risk of a serious medical injury? Well, in this instance, it just had to be serious medical harm. But in this instance, obviously, he died. But in this instance, they may have been negligent. Now, the evidence is disputed, but that's irrelevant at this stage. Let's say his pulse was 111, which is a little bit up, which is elevated. Let's say the pulse oximeter level was 92. And let's say they were aware he was foaming at the mouth. Now, there was one deputy who testified to that. There's actually no evidence that they actually knew it. But let's just assume they knew that. Now, they may have been negligent in not administering further treatment, which, of course, as we know, wouldn't have done any good. But that's irrelevant. That's irrelevant for purposes of deliberate indifference. OK, they may have been negligent in doing that, but they didn't just ignore it. And that's what the recklessness that's defined by the Supreme Court requires. What if you're saying, I just I want to try to understand the line that you're drawing there. So you're saying that if the EMT paramedic shows up and there's a guy in the backseat and he's kind of, you know, the cops are like, well, this guy's he's unresponsive. And, you know, we want you to check him out. And the EMTs just say, no, we're good. And they just leave that that's deliberate indifference. But nothing else short of that would be deliberate indifference. I think if they had just observed him and did basically nothing to check him, then that would be deliberate indifference. But in this instance. Yeah, what if they I mean, here here are the thing I think that's questionable. And there's a qualified immunity issue here, too, I think. But, you know, 94. I forget the, you know, breath, I'll say oxygen level is sort of the cutoff, it seems. And we're talking about 92. And then a pulse of 111 is a problem. But it is one aspect here that is just not really far off of what the parameters should be. I mean, what if his what if his breath was at 50 or something like that? I mean, would you concede that there would be a difference in that circumstance? I think that is one way to look at it, Your Honor. Yes, they did not ignore him. And these ranges, even under the testimony, were not outrageous. And the testimony is that to the 111 that that might be worth monitoring. There's nothing in the record that I can recall them. I'm sure my opponent might point it out as to what to do if the pulse ox is 92. So this is not an instance of just absolutely disregard. It's not just simply it has to be more than negligence, more than gross negligence. It has to be reckless to be a constitutional violation. I see my time is up. If the court has further questions, I'm happy to answer. Thank you very much, Mr. Markovic. Mr. Pilovic. I'd like to touch on three issues. First, I would like to read from Brooks versus Warden, published in 2015, which defines the causation necessary to succeed in the 1983 claim as establishing a causal connection between the defendant's conduct and the Eighth Amendment violation. It's because Section 1983 is designed to vindicate constitutional rights. This court also recently recognized that principle in Hover versus Marks. Although that was a PLRA case, in ruling that nominal and punitive damages were available there in absence of physical harm, the court recognized that nominal damages were available to a plaintiff who could not prove compensable damages. Yeah, but there was no question that there was an injury. That's the problem. The injury in Hover was that the guy's material was, I mean, that he was hit by these prison guards. I mean, he had an injury. It wasn't quantifiable. That was the issue. Here, the question is, this guy is suffering from, you know, something that no one did to him. It was just a naturally occurring event. And so it seems to me like if you want to show an injury at all, you have to show some kind of causal relationship between what the people did, which is nothing, and the result. And I believe that's necessary for compensatory damages. I believe the law is that the causal connection to the constitutional violation is dated to Section 1983. Are you saying that there's a constitutional violation? Let's say someone is suffering, you know, someone is just in a jail cell and they suffer a heart attack and a cop walks by and he says, you know what? I just don't care whether you're suffering a heart attack or not. And he just walks on. That even though there was nothing that could be done, that no one could do anything for this person, and he was just going to die of natural causes no matter what, because the officer had the subjective mental idea of I just don't care, that that in and of itself was a constitutional violation? Yes.  And that's also reinforced by Williams v. Aguirre in the Fourth Amendment context where the court recognized nominal damages were available for a constitutional violation for an incarceration that overlapped with another incarceration, i.e. that he would have been in jail anyway. Even in that circumstance, if an officer overcharges, they can be liable for nominal damages. The defendants both testified below 94 means provide oxygen. That's their testimony and that's their policy. And with regard to qualified immunity, as my time runs out, I would direct the court to a recent case, Patel v. Lanier County. These defendants, which discusses that qualified immunity is generally unavailable when an official abandons a patient, which is what these officials did. They did tests, and those tests showed them that danger was there. It is worse than if they had done no tests because the pulse ox said low O2, high pulse. That told them there was even more danger than they would have known had they not done that test. And in response, they abandoned it. And I think what note 11 of Patel speaks to that point. Patel's a little bit different, though. Patel was the driver. I was on that panel. Patel was the driver of the transport vehicle and kept the detainee in the back of an un-air-conditioned vehicle for over two hours. He sat there for a long period of time. And the position was that the not doing nothing was the transport driver not getting him medical attention. That's a little bit different here. The facts are a little. I'm sorry. You had medical attention, but you're arguing that the attention was so sparse and so spare that it rose to the level of what we're going to do. Yes, my citation to Patel is more for the proposition that there is no prior case on point necessary when there is subjective knowledge and no attempt to take it. And footnote 11 discusses some of what we put in our brief in terms of, we think it is unlikely that an officer will be able to avail himself of qualified immunity, whereas here the evidence allows the inference that of and flatly ignored a risk of serious harm requiring medical attention. Although there was medical attention, all that medical attention was was enough to put these EMS personnel on notice that the risk of harm is there. It's almost as if they checked on him. They realized it was even worse than it might appear. And then they left. Thank you. Right. Thank you both very much. That constitutes the end of our session today. We'll be in recess until tomorrow. Thank you.